DECISION
{¶ 1} Relator, Carl Franklin Spears, commenced this original action in mandamus seeking an order compelling respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying him permanent total disability ("PTD") compensation and to enter an order granting said compensation.
 {¶ 2} Pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) In his decision, the magistrate found the commission did not abuse its discretion in determining that relator was capable of sustained remunerative employment based upon Dr. Reynolds' reports. Because Dr. Reynolds opined that relator could do "light work" with some restrictions, there was some evidence to support the commission's order. The magistrate further found that Dr. Reynolds' failure to place a checkmark by "sedentary work" on the physical strength rating ("PSR") form was of no consequence given that light work, by definition, includes sedentary work.
 {¶ 3} Likewise, the magistrate found some evidence to support the commission's finding that relator refused offers of vocational rehabilitation based upon the July 9 and November 8, 2001 closure reports. The fact that the commission mistakenly referenced an additional date when rehabilitation was allegedly refused was of no consequence given the other evidence supporting the commission's finding that relator repeatedly refused offers of vocational rehabilitation without justification. Therefore, the magistrate has recommended that we deny mandamus relief.
 {¶ 4} Relator has filed objections to the magistrate's decision essentially rearguing the same points that were adequately addressed by the magistrate. Relator takes issue with the magistrate's determination that "light work," by definition, includes "sedentary work." We find that the magistrate's reasoning is sound and is consistent with the definitions included in the PSR form.
 {¶ 5} Relator also argues that the closure reports are not some evidence justifying the commission's finding that relator refused vocational rehabilitation. We disagree. Relator fails to explain why the closure reports are not some evidence supporting the commission's decision. In essence, relator simply disagrees with the conclusions reflected in the closure reports. Despite relator's disagreement, the closure reports are some evidence supporting the commission's decision. Therefore, we overrule relator's objections.
 {¶ 6} Following an independent review of this matter, we find that the magistrate has properly determined the facts and applied the appropriate law. Therefore, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we deny the requested writ of mandamus.
Objections overruled; writ of mandamus denied.
Brown and McGrath, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. : Carl Franklin Spears, : :
Relator, : :
v. : No. 05AP-96 :
Industrial Commission of Ohio : (REGULAR CALENDAR) and Barnes Stucco, Inc., : :
Respondents. :
 MAGISTRATE'S DECISION Rendered on July 28, 2005 William P. Bringman Co., L.P.A., and William Paul Bringman,
for relator.
Jim Petro, Attorney General, and Shawn M. Wollam, for respondent Industrial Commission of Ohio.
 IN MANDAMUS {¶ 7} In this original action, relator, Carl Franklin Spears, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him permanent total disability ("PTD") compensation and to enter an order granting said compensation.
Findings of Fact:
 {¶ 8} 1. Relator has sustained three industrial injuries. Claim number 98-341504 is allowed for: "tear rotator cuff, left; displacement of bicep tendon, left." Claim number 99-602539 is allowed for: "sprain of wrist nos, left." Claim number 01-349090 is allowed for: "sprain rotator cuff, right; tear rotator cuff, right."
 {¶ 9} 2. On September 8, 2003, relator filed an application for PTD compensation.
 {¶ 10} 3. On August 31, 2004, relator was examined by William Reynolds, M.D. In his narrative report, Dr. Reynolds states:
It is my opinion at this point injured worker has reached a level of MMI. Using the AMA Guides, 4th edition, I would estimate his impairment of function of the man as a whole to be in the range of 4% for the right shoulder. On the left shoulder, in which he had a tendonesis of the biceps tendon and some shoulder atrophy, I estimate the impairment on that side to be in the range of 16%. This gives him a permanent partial impairment of the function of the man as a whole in the range of 20%. There is 0% for the wrist sprain.
 {¶ 11} 4. On August 31, 2004, Dr. Reynolds completed a physical strength rating ("PSR") form. The form asks the examining physician to indicate by checkmark whether "[t]his injured worker is capable of physical work activity as indicated below." (Emphasis omitted.) Dr. Reynolds responded to this query with a checkmark.
 {¶ 12} Underneath the above-noted query, the PSR form lists the classifications of physical demands of work and their definitions. Dr. Reynolds placed a checkmark by "light work" and then wrote "unable to work with arms above shoulder [height]."
 {¶ 13} 5. The commission requested an employability assessment report from Jeffrey R. Berman, a vocational expert. The Berman report, dated November 2, 2004, responds to the following query:
Based on your separate consideration of reviewed medical and psychological opinions regarding functional limitations which arise from the allowed condition(s), identify occupations which the claimant may reasonably be expected to perform, (A) immediately and/or, (B) following appropriate academic remediation or brief skill training.
 {¶ 14} Indicating acceptance of Dr. Reynolds' reports and responding to the above query, Berman listed the following employment options:
a. Thirteen job titles were identified via transferable skills analysis. All thirteen were eliminated based on the lack of work experience or the requirement to reach or lift overhead.
b. Bakery Worker-Converyor [sic] Line, Assembler, Food Preparation Worker, Pizza Maker, Sandwich Maker and Fast Foods Worker are potential options after on the job training.
Under "Effects of Other Employability Factors," Berman wrote:
[One] Question: How, if at all, do the claimant's age, education, work history or other factors (physical, psychological and sociological) effect his/her ability to meet basic demands of entry level occupations?
Answer: Age: Advancing age can affect a person's ability to adapt to new work situations and learn new skills or procedures. Severity of the disability, work history and level of education are factors to consider in combination with age.
Education: The injured worker is a high school graduate which is adequate academic preparation for many light and some sedentary strength range occupations.
Work History: The documented work history is thirteen years of employment as a stucco installer. This is a skilled occupation with limited transferability of the acquired skills to other occupations in the light strength physical demand level.
* * *
[Two] Question: Does your review of background data indicate whether the claimant may reasonably develop academic or other skills required to perform entry level Sedentary or Light jobs?
Answer: No data suggests the inability to learn entry level skills or procedures through on-the-job training.
Under "Employability Assessment Database," Berman wrote:
B. WORK HISTORY
 Job Title * * * Skill Strength Dates Level Level
 Stucco Installer * * * Skilled Medium 1988-2001 (Mason)
C. EDUCATIONAL HISTORY
 Highest Grade Completed: 12 Date of Last Attendance: 1957 H.S. Graduate: Yes GED: N/A Vocational Training: None ICO Educational Classification: High School Graduate
 {¶ 15} 6. Following a January 6, 2005 hearing, a staff hearing officer ("SHO") issued an order denying relator's PTD application. The SHO order states:
The Staff Hearing Officer relies upon the persuasive reports dated 8/31/2004 that were prepared by Industrial Commission Orthopedic Medical Specialist Dr. Reynolds. The doctor supports the conclusion that the allowed physical conditions do not prevent the injured worker from engaging in types of sustained remunerative employment within the sedentary and up to light physical ranges of employment, so long as the injured worker does not do work with his arms above shoulder length.
The Staff Hearing Officer agrees. The residual functional capacities as set forth in the above persuasive medical reports clearly would not physically prevent the injured worker from engaging in sustained remunerative employment consistent with various job titles.
The Staff Hearing Officer notes that the Dictionary of Occupational Titles list several types of job titles that fit within the unskilled, entry-level restricted light duty employment restrictions faced by individuals such as the injured worker in this claim. These are jobs that do not require any transferable skills, or even a high school education. Rather, these jobs can be learned and performed by individuals while on-the-job, and within a matter of days. The following list of jobs is not meant to be exhaustive. Rather, it is a partial listing of the kinds of jobs that the Staff Hearing Officer considers to be current employment options for the injured worker, since they are unskilled, entry-level types of employment that fall within the allowed physical restrictions of the injured worker. In addition, these jobs do not require transferable skills or rehabilitation programming.
These job titles include, but are not limited to: addresser, mailing house; ampoule sealer; assembler, small products; atomizer assembler; assembly press operator; bench assembler; bench hand; circuit board inspector; crate liner, cutter and paster; dowel inspector; election clerk; electrical accessories assembler; electronics worker; engraver; escort vehicle driver; final assembler, optical goods; food checker; gluer; greeter; hand packager; hand mounter; hand splitter; heat sealer; information clerk; inspector, eyeglass frames; lens inspector; machine engraver I; microfilm document preparer; notch grinder; nut sorter; odd piece checker; order clerk, food and beverage; paint spray inspector; patcher; preparer; photo mounter; production inspector; semiconductor bonder; semiconductor inspector; small products assembler; small products inspector; soldering-machine tender; sorter; sticker; stuffer; surveillance system monitor; table worker; telephone solicitor; ticket seller; toggle-press folder and feeder; toy assembler; wire worker; zipper joiner; and zipper measurer.
These are all unskilled, entry level types of employment that could be performed by the injured worker, so long as he did not use his arms for work above shoulder level. Many to all of those jobs can be performed or else modified to be performed without working with one's arms above shoulder level.
The injured worker indicated at hearing that the injured worker is currently approximately 65 years of age. The Staff Hearing Officer finds that the injured worker's age is overall viewed as a neutral vocational asset. The injured worker's age in and of itself clearly would not prevent the injured worker from obtaining and performing sustained remunerative employment consistent with the jobs identified above as being current employment options for the injured worker. The Staff [H]earing Officer notes that there are numerous individuals in the job force at age 65 years or older who obtain and perform jobs similar to the ones already identified as current employment options for the injured worker. [T]his is truer still when one considers that the injured worker was approximately 61 years of age when he last worked. In addition, the injured worker has three times previously in this claim refused to participate in rehabilitation or vocational programming that was offered to him. These refusals occurred on or about 7/09/2001, 10/18/2001, and 11/08/2001. The files were closed due to lack of interest by the injured worker.
This lack of motivation by the injured worker is significant, because the injured worker indicated at today's hearing that there are even now jobs that he believes he is capable of performing. Two jobs that were described to him were those of Greeter at Wal-Mart and surveillance security monitor. The injured worker indicated that he could do those jobs.
The injured worker indicated at hearing that the injured worker has completed the High School level of education. The Staff Hearing Officer finds that the injured worker's level of education is overall viewed as a positive vocational factor. The injured worker is able to read, to write, and to perform basic math. The injured worker's educational level, in combination with the ability to read, write, and to perform basic math, would assist the injured worker in obtaining and performing the entry-level, unskilled types of employment identified above as being current employment options for the injured worker. As previously discussed these are jobs that do not require any transferable skills, or even a high school education. Rather, these jobs can be learned and performed by individuals while on-the-job, and within a matter of days.
The injured worker's prior work history was identified as including the following: stucco installer and supply clerk. [T]he Staff Hearing [O]fficer finds that the injured worker's prior work history is overall viewed as being a neutral vocational asset. While the injured worker may not have obtained readily identifiable transferable skills from his prior jobs, he does not need transferable skills to perform the jobs already previously identified as current employment options for the injured worker.
Based on a careful consideration of the above, as well as all of the evidence in file and at hearing, the Staff Hearing Officer concludes that the injured worker is capable of performing sustained remunerative employment consistent with the job titles already identified as being current employment options, including the jobs that the injured worker indicated that he believes he is capable of performing now. Therefore, the injured worker is not permanently and totally disabled.
 {¶ 16} 7. On January 31, 2005, relator, Carl Franklin Spears, filed this mandamus action.
Conclusions of Law:
 {¶ 17} Two issues are presented: (1) whether the commission abused its discretion in determining residual functional capacity based upon the reports of Dr. Reynolds; and (2) whether the commission abused its discretion in determining that relator unjustifiably refused to participate in rehabilitation or vocational programs offered to him.
 {¶ 18} Finding no abuse of discretion, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 19} Turning to the first issue, the commission determined that relator retains residual functional capacity for "sedentary and up to light physical ranges of employment, so long as [he] does not do work with his arms above shoulder length."
 {¶ 20} Relator contends that because Dr. Reynolds did not place a checkmark by "sedentary work" on the PSR form, there is no evidence that he can perform sedentary employment. Relator is incorrect. Dr. Reynolds placed a checkmark by "light work." By definition, light work includes sedentary work. Thus, Dr. Reynolds' PSR report indeed provides the some evidence that relator can perform sedentary work.
 {¶ 21} Relator contends that the commission's finding that he can perform "up to light physical ranges of employment" is not supported by Dr. Reynolds' reports. The magistrate disagrees.
 {¶ 22} The SHO's use of the term "up to" is an apparent recognition that Dr. Reynolds placed a restriction on the light work relator can perform. Dr. Reynolds wrote "unable to work with arms above shoulder [height]." Even if it can be argued that the term "up to" is inartfully used, the commission's determination of residual functional capacity is reasonably clear. There is no abuse of discretion.
 {¶ 23} Relator also argues:
* * * Furthermore, the decision refers to "above shoulder length" and the evidence has no reference to that phrase contained in it. That phrase in and of itself is ambiguous and has no meaning within the context of the sentence in which it is used. Therefore, reliance upon that phrase in making the denial decision is an abuse of discretion.
(Relator's brief at 6-7.)
 {¶ 24} Obviously, the commission's use of the term "above shoulder length" does not comport with Dr. Reynolds' restriction of arm use "above shoulder [height]." However, at a later point in the commission's order, the term "above shoulder level" is used.
 {¶ 25} The term "above shoulder level" does fairly equate with the term "above shoulder height."
 {¶ 26} Use of the term "above shoulder length" in one portion of the order instead of "above shoulder height" or "above shoulder level" does not fatally flaw the commission's order. Read in its entirety, the order unambiguously explains the reasoning of the commission's decision.
 {¶ 27} Accordingly, the commission did not abuse its discretion in determining relator's residual functional capacity based upon Dr. Reynolds' reports.
 {¶ 28} Turning to the second issue, the Supreme Court of Ohio has repeatedly addressed the obligation of a PTD claimant to undergo opportunities for rehabilitation. State ex rel. B.F.Goodrich Co. v. Indus. Comm. (1995), 73 Ohio St.3d 525; Stateex rel. Bowling v. Natl. Can Corp. (1996), 77 Ohio St.3d 148;State ex rel. Wood v. Indus. Comm. (1997), 78 Ohio St.3d 414;State ex rel. Wilson v. Indus. Comm. (1997), 80 Ohio St.3d 250;State ex rel. Cunningham v. Indus. Comm. (2001),91 Ohio St.3d 261.
 {¶ 29} In B.F. Goodrich, the court states:
The commission does not, nor should it, have the authority to force a claimant to participate in rehabilitation services. However, we are disturbed by the prospect that claimant may have simply decided to forgo retraining opportunities that could enhance re-employment opportunities. An award of permanent total disability compensation should be reserved for the most severely disabled workers and should be allowed only when there is no possibility for re-employment.
Id. at 529.
 {¶ 30} In Wilson, the court states:
We view permanent total disability compensation as compensation of last resort, to be awarded only when all reasonable avenues of accomplishing a return to sustained remunerative employment have failed. As such, it is not unreasonable to expect a claimant to participate in return-to-work efforts to the best of his or her abilities or to take the initiative to improve reemployment potential. While extenuating circumstances can excuse a claimant's nonparticipation in reeducation or retraining efforts, claimants should no longer assume that a participatory role, or lack thereof, will go unscrutinized.
Id. at 253-254.
 {¶ 31} In its order, after noting that relator is currently 65 years of age and that he last worked at age 61, the commission states:
* * * [T]he injured worker has three times previously in this claim refused to participate in rehabilitation or vocational programming that was offered to him. These refusals occurred on or about 7/09/2001, 10/18/2001, and 11/08/2001. The files were closed due to lack of interest by the injured worker.
This lack of motivation by the injured worker is significant, because the injured worker indicated at today's hearing that there are even now jobs that he believes he is capable of performing. Two jobs that were described to him were those of Greeter at Wal-Mart and surveillance security monitor. The injured worker indicated that he could do those jobs.
 {¶ 32} The record contains a "vocational rehabilitation closure report," dated July 9, 2001, stating:
This I[njured] W[orker] was referred for Vocational rehabilitation services on 6/13/01. The case was referred to this case manager on 6/18/01 and a telephone message was left for the IW. Telephone contact was made with th[e] IW on 6/20/01 at which time an appointment was made to meet him at Dr. David Jackson's P[hysician] O[f] R[ecord] office on 6/22/01. The POR noted on exam that the IW is ready for an active physical therapy program at 3 times a week for 6 wks, as well as, a Vocational evaluation. The IW's next POR appt is August 17, 2001. On 6/22/01 I spoke with the IW and explained the benefits of Voc Rehab Services to assist in coordinating services and assisting in a safe return to the work either to his original employer or to another employer, [t]he IW stated that he was not interested in Voc Rehab services. I visited the Physical therapy dept and gave them the C9 authorization for the physical therapy on 6/28/01. The therapist set a 7/9/01 start date for the therapy. I contacted the IW on 6/28/01 to confirm with him that he could start physical therapy on 7/9/01 and he again stated that he was not interested in Voc Rehab services. I again explained the benefits of the services to the IW who stated his understanding and declined the services. Contact was made with a Vocational evaluator on 6/28/01 to set up appointment for the evaluation. (the voc eval can be done outside of plan) On 7/6/01 contact was again made with the Vocational evaluator. The Vocational evaluator explained that he had spoken with the IW in attempt to set up appointment and the IW indicated that he did not want to have the Vocational evaluation done. The job focus for the Vocational Rehabilitation services was for different job with a different employer since the POR had written in his office notes that the IW would not be able to return to his previous job description.
 {¶ 33} The record contains another "vocational rehabilitation closure report," dated November 8, 2001, stating:
* * * On 11-5-01, C[ase] M[anager] again called the IW to offer a job placement plan for voc rehab. The IW stated he had been looking for work, but could not find any. CM reiterated to the IW the benefits of a job placement program in finding employment. The IW stated he still did not think he could work, and the he had called the POR's office "awhile back" to discuss his release with the POR, but was "put on hold and hung up." IW stated he had not called back. CM explained to IW that his file for voc rehab would close as he is not interested in job [placement].
 {¶ 34} Respondent concedes here that the record does not support the commission's finding regarding the October 18, 2001 date. However, the record supports a finding that relator refused offers of vocational rehabilitation on two occasions, i.e., on or about July 9 and November 8, 2001, as described in the two closure reports.
 {¶ 35} Relator argues that the commission's error regarding the October 18, 2001 date is fatal to its finding that relator demonstrated a lack of interest or lack of motivation for vocational rehabilitation. The magistrate disagrees.
 {¶ 36} The closure reports of July 9 and November 8, 2001 provide some evidence to support the commission's finding. In fact, the closure reports provide substantial factual detail showing that relator was repeatedly offered vocational rehabilitation, but simply refused without justification. The commission's error regarding the October 18, 2001 date does not undermine its finding that relator refused offers of vocational rehabilitation without justification.
 {¶ 37} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
 s/s Kennenth W. Macke
KENNETH W. MACKE MAGISTRATE